**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**UNITED STATES OF AMERICA,**

**v.**                                                                    Criminal No. **3:21CR132**

**JAYSON RYMAN COLAVALLA,**

Petitioner.

**MEMORANDUM OPINION**

Jayson Ryman Colavalla, a federal inmate proceeding *pro se*, filed this 28 U.S.C. § 2255

motion to vacate, set aside, or correct his sentence. ("§ 2255 Motion," ECF No. 251.) Colavalla

contends that he is entitled to relief upon the following ground:[1]

| | |
|---|---|
| Claim One: | "Violation of the Sixth Amendment right to effective assistance of counsel. There was virtually no communication with my attorney. He rarely answered phone calls, texts, or emails. The result was a failure to understand my Plea Agreement or the overall exposure I had to incarceration. When we did communicate, we did nothing but argue, this fact is supported in the transcripts of both the change of plea and sentencing hearings. This all resulted in my seeking advice and assistance from an attorney that I did not know was disbarred. His recommendations, and efforts to assist my interests, resulted in my obstruction of justice enhancements and disqualification for acceptance of responsibility." (*Id.* at 4.) |

The Government filed a response. (ECF No. 256.)  After receiving two extensions of time,

Colavalla filed a Reply. (ECF No. 278.) Because Colavalla's contentions are belied by the record,

the § 2255 Motion will be DENIED because it lacks merit.

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system to the parties' submissions. The Court corrects the capitalization and punctuation in quotations from Colavalla's submissions.

## I.   PROCEDURAL HISTORY

### A.   Superseding Indictment

On May 4, 2022, the grand jury charged Colavalla with conspiracy to commit wire fraud (Count 1); five counts of wire fraud (Counts 6–10); and, conspiracy to launder monetary instruments (Count 11).  (ECF No. 33, at 1.)[2]  Colavalla was released on bond until after his trial. (ECF No. 50.)  The facts regarding the criminal enterprise are long, but are aptly summarized by the Government as follows:

> From 2016 through 2021, the defendant, Jayson Ryman Colavalla . . . , along with his co-conspirators, Richard Thornhill Crock, Anthony McNeil, and Ksyntoilious Miller, orchestrated a multimillion dollar advance fee scheme to steal money from unsuspecting individuals, churches, and other small businesses.  The defendant and his co-conspirators preyed on victims who could not obtain loans through conventional lenders and were desperate for funding.  Promising loans in exchange for up-front deposits, purported to be held in "escrow," the defendant and co-conspirators made off with their victims' money, often with tragic collateral consequences.

(ECF No. 151, at 1.)

### B.   Plea Agreement

On January 6, 2023, Colavalla, who was represented by Jose Aponte, Esq., entered into a written Plea Agreement to Count One of the Superseding Indictment.  (ECF No. 102 ¶ 1.) Specifically, the Plea Agreement stated that Colavalla faced a statutory maximum term of 20 years of imprisonment.  (*Id.*)  Colavalla agreed that he was "plead[ing] guilty because he is in fact guilty of the charged offense.  The defendant admits the facts set forth in the Statement of Facts filed with this Plea Agreement and agrees that those facts establish guilt of the offense charged beyond a reasonable doubt."  (*Id.* ¶ 2.)  Colavalla also agreed that the Court had the "authority to impose any sentence within the statutory maximum described above" and that "the defendant cannot

---

[2] Two of Colavalla's co-defendants were indicted on November 16, 2021.  (ECF No. 8.) A third, was indicted for the first time with Colavalla.

withdraw a guilty plea based upon the actual sentence." (*Id.* ¶ 4.) Colavalla agreed that he was "satisfied that the defendant's attorney ha[d] rendered effective assistance," and that he was giving up his trial rights. (*Id.* ¶ 3.) The Government agreed that, in exchange for Colavalla's guilty plea to Count One, it would move to dismiss the remaining six counts at the conclusion of sentencing. (*Id.* ¶ 7.) By signing the Plea Agreement, Colavalla averred:

> I hereby agree that I have consulted with my attorney and fully understand all rights with respect to the pending Superseding Indictment. Further, I fully understand all rights with respect to 18 U.S.C. § 3352 and the provisions of the Sentencing Guidelines Manual that may apply in my case. I have read the Plea Agreement and carefully reviewed every part of it with my attorney. I understand this agreement and voluntarily agree to it.

(*Id.* at 13.) Colavalla also agreed that he understood that if he "with[drew] from this agreement, or commit[ted] or attempt[ed] to commit any additional federal, state, or local crimes, or intentionally g[ave] materially false, incomplete, or misleading testimony or information, or otherwise violate[d] any provision of this agreement," then he could be subject to prosecution for those crimes and "perjury and obstruction of justice." (*Id.* ¶ 15.)

During the Rule 11 hearing, Colavalla agreed that he had reviewed the charges against him "in depth" with his attorney and was fully satisfied with the services and advice provided by counsel. (ECF No. 212, at 10–11.) When asked whether counsel had answered all of his questions, Colavalla stated, "Oh, he answered them all," and Colavalla agreed there was nothing he had "asked [counsel] to do that he ha[d] not done for [him]." (*Id.* at 11.) Colavalla agreed that he understood that there was no agreement with respect to his sentence and that the Court would determine his sentence. (*Id.*) Colavalla agreed that he and counsel "went over [the Plea Agreement] thoroughly," and they "went around and around," but that counsel explained everything to him. (*Id.* at 12.) When asked whether the Statement of Facts was true, Colavalla claimed, "[i]t is a version of it. I believe that there is more context to it, but it for the most part I

would say it was true." (*Id.* at 13–14.) Following up, the Court asked Colavalla a long series of question to ascertain what he meant by that statement, Colavalla attempted to disavow his culpability, and the Court concluded, "So what we have here, Mr. Aponte, is a person who does not believe he is guilty." (*Id.* at 19.) Colavalla continued to argue, and the Court told him to be quiet, because he would "dig [him]self into a hole here." (*Id.* at 19–20.) Counsel indicated:

> I understand that is how it appears, but I think in the conversations we have had, without violating any ethics, I think I explained to him the way things would appear, the way evidence would come up during the course of trial. I think he understood my perspective, and that is why we made this decision to plead guilty.

(*Id.* at 20.) Counsel for the Government further noted that,

> it is certainly fair to infer that at a minimum Mr. Colavalla was sticking his head in the sand intentionally, you know, essentially engaging in willful blindness or deliberate indifference to what was going on around him. And perhaps he is struggling with that particular concept. But there is certainly adequate evidence set forth, or adequate facts set forth in the statement of facts from which The Court can infer; one, there was a tacit agreement between him and the co-conspirators; even if he didn't know exactly what the other co-conspirators were doing; and two, that he was wilfully [sic] blind to what was going on around him, which, suffices to support an inference of intent in this case.

(*Id.* at 20–21.) The Court then asked Colavalla if he believed that he was guilty of conspiracy to commit wire fraud, and Colavalla agreed that he was. (*Id.* at 21.) Colavalla also agreed that he signed the Statement of Facts because it was true and that he was pleading guilty because he was in fact guilty. (*Id.* at 22.)

Colavalla indicated that he and counsel went over the evidence that the Government would present against him if he had gone to trial. (*Id.* at 23.) Colavalla agreed that he had told counsel his "version of the facts . . . in some detail," and that he had not hidden any information from his attorney. (*Id.*) The Court asked Colavalla whether he agreed that he expected he "may get a break in sentencing because [he was] cooperating against other people who [were] involved in this," and Colavalla agreed that he did." (*Id.* at 24.) The Court further explained to him "that is uncertain at

best" and that "the government can't promise you that that will happen," and Colavalla agreed that he understood that. (*Id.*) The Court then re-emphasized that

> there is no agreement about the sentencing that you will get. Mr. Aponte is a very serious lawyer. I am sure he has given you the range of sentences that are available in this case. But you need to understand that he can't tell you -- he can't make a promise to you of what your sentence is going to be. Neither can Mr. Moore. Neither can I right now. At some point in the future however, I will determine that sentence. Do you understand that?

(*Id.* at 26.) Colavalla answered in the affirmative. (*Id.*)

Colavalla noted that no one had made any promises or threats to induce his plea, and he was pleading guilty of his own free will and because it was in his best interest. (*Id.* at 25–26.) The Court asked Colavalla if he and counsel had discussed the sentencing guidelines, and he responded, "Oh, yes." (*Id.* at 28.) The Court briefly explained how the sentencing guidelines worked but then made sure that Colavalla understood that "[t]he guidelines are not certain," that the Court did "not need to follow them," and that the Court could "go above the guidelines or below the guidelines," depending on Colavalla's culpability. (*Id.* at 30.)

The Court then covered the elements of what the Government would need to prove for conspiracy to commit wire fraud and asked Colavalla if he believed the Government could prove each of these factors if the case went to trial. (*Id.* at 37.) Once again, Colavalla waffled in his answer, and the Court stated: "The question is not whether you think you are innocent of this, the question is whether you believe the government could prove each of these facts beyond a reasonable doubt." (*Id.* at 37.) Colavalla stated: "A part of me says, yes. And a part says no." (*Id.* at 37.) The Court responded: "If you don't think -- if you don't agree that the government could prove each of those facts beyond a reasonable doubt we will just adjourn today and come back and you can go to trial in this case whenever." (*Id.* at 37–38.) Colavalla then agreed that he

5

believed the Government could prove him guilty beyond a reasonable doubt, and the Court was satisfied with his answer. (*Id.* at 38.) The Court further noted

> I understand that you think you are not the most guilty person in this agreement. But, if you don't think you are guilty in a few minutes this lady right there to my right is going to ask you whether you plead guilty or not guilty. That is the choice, where the rubber hits the road. If you don't think you are guilty, don't plead guilty. But if you understand that you are guilty and this it is in your best interest to plead guilty, you should do what you think is right. All right?

(*Id.* at 38–39.) Colavalla asked for additional time to talk to counsel before entering his plea. (*Id.* at 39.) Colavalla then entered his guilty plea to Count One. (*Id.* at 40.) The Court found Colavalla fully competent and capable of entering his plea, that he was aware of the charges and the consequences of the plea, that it was knowing and voluntary and based on an independent factual basis supporting the elements of the offense. (*Id.* at 40–41.) The Court, therefore, found him guilty of Count One. (*Id.* at 41.)

The Court instructed Colavalla to note to counsel if he found anything in the presentence report that he disagreed with and counsel would let the Court know. (*Id.* at 41.) The Court explained that counsel would make arguments about what sentence he should receive, but that Colavalla would have a chance to talk with the Court about what his sentence should be also. (*Id.* at 41.) The Court allowed Colavalla to remain out on bond in North Carolina until his sentencing, which was initially scheduled for June 5, 2023.

### C.    Colavalla's Actions Leading up to Sentencing

On May 1, 2023, a Presentence Investigation Report ("PSR") was prepared and filed with the Court. (ECF No. 125.) The probation officer noted that she had no information that Colavalla had obstructed justice and agreed that he had "clearly demonstrated acceptance of responsibility for his criminal conduct." (*Id.* ¶¶ 27–28.) Colavalla's Base Offense Level was 7; however, he received an 18-level increase because the amount of loss was more than $3,500,000 but less than

$9,500,000, and an additional 2-level increase because the offense had more than ten victims. (*Id.* ¶¶ 30–32.) With a 3-level deduction for acceptance of responsibility, Colavalla had a Total Offense Level of 24 and a Criminal History Category of I, which resulted in an advisory guidelines range of 51 to 63 months of imprisonment. (*Id.* ¶¶ 38–40, 64–65.)

On May 10, 2023, counsel for the Government notified the probation officer that the losses were overstated in the initial PSR and that they should be $2.3 million. (ECF No. 142, at 25.) Accordingly, the Government believed that a 16-level increase was appropriate, instead of an 18-level enhancement. (*Id.*) In the May 17, 2023 revised version of the PSR, Collavalla's Total Offense Level decreased to 22, and his advisory guidelines range became 41 to 51 months of imprisonment. (*Id.* ¶¶ 40, 64–65.)

On June 7, 2023, the probation officer filed a Petition for Action on Conditions of Pretrial Release requiring Colavalla to show cause why his bond should not be revoked for violating the conditions of his release.[3] (ECF No. 172.) The probation officer explained as follows:

> FBI Agents have received communications that have occurred between Mr. Colavalla, a disbarred attorney (Mr. Turner), who states he represents Mr. Colavalla, and an identified victim in this case.
> On May 13, 2023, Mr. Turner, who identifies himself from [the] Beard Law Firm, sent an email to identified victims in the pending case. In that email, he indicates that his firm holds electronic coins provided by Mr. Colavalla for the purpose of reimbursing the victims for their lost funds. This email also asks the victim to sign a document declaring they do not hold Mr. Colavalla responsible, either legally or financially, and they do not wish any legal matters to be pursued against Mr. Colavalla.
> The victim responded to this email and also provided copies to the FBI Agent. On May 30, 2023, after having asked some questions and receiving answers from Mr. Turner's email, the victim endorsed a release indicating that $363,000.00 had been reimbursed by Mr. Colavalla.

---

[3] Colavalla agreed that, to remain on bond, he was required to "avoid all contact, directly or indirectly, with any person who is or may become a victim or witness in the investigation or prosecution." (ECF No. 50-1, at 2.) Colavalla also was specifically prohibited from contacting "[a]ny actual or potential client/customer . . . to include any individuals from whom any of [the named companies] successfully or unsuccessfully solicited funds." (*Id.* at 4.)

7

On June 2, 2023, Mr. Turner instructed the victim to set up a "Metamask" wallet to receive a transfer. He then forwarded an email from Jayson Colavalla's known email account, with specific instructions on how to set this account up. According to the United States Attorney, Mr. Colavalla has admitted to ownership of the email address used, and has admitted to sending and receiving emails from the account.

One June 2, 2023, Mr. Turner indicates to the victim that a transfer of cryptocurrency had been sent out. On that same date, the victim indicated that the transfer had been received. According to the FBI Agent, this cryptocurrency had nearly zero value.

(ECF No. 172, at 1.) On June 8, 2023, an arrest warrant was issued for Colavalla. On June 14, 2023, he was arrested. His bond was eventually revoked. (ECF Nos. 174, 179, 196.)

On June 28, 2023, the probation officer filed an addendum to the PSR. (ECF No. 184, at 27.) The probation officer recounted Colavalla's actions post-plea, and noted that:

> Considering this new information, the probation officer believes that the defendant has obstructed justice in that he attempted to obstruct or impede, the administration of justice with respect to the sentencing of the instant offense; therefore, a 2-level enhancement pursuant to USSG § 3C.1 is applicable in this case.
>
> Additionally, based upon the above information, the defendant has not clearly demonstrated acceptance of responsibility. He violated the conditions of his bond and contacted one of the victims of the offense. He misled the victim, had the victim sign a document, and transferred crypto-currency to make the victim whole. This crypto-currency was worth less than a penny. Therefore, the 2-level reduction pursuant to USSG § 3C1.1(a) has been removed.
>
> The Government has also indicated that they will not be filing a motion, pursuant to USSG § 3E1.1(b), for the additional 1-level reduction for acceptance of responsibility.
>
> Based on the above changes, the defendant's Total Offense Level has increased from 22 to 27, his guidelines range has increased from 41 – 51 months to 70 – 87 months, and his fine range has increased from $15,000 – $150,000, to $25,000 – $250,000.

(*Id.* at 27–28.) Counsel filed objections to the revised PSR, arguing that it was improper to remove the three points for acceptance of responsibility and to add the 2-level enhancement for obstruction of justice because Colavalla had demonstrated that he accepted responsibility and the "contacts with the victim appear[ed] to be made in an effort to make restitution in advance of the Court hearing." (*Id.* at 28.) Counsel argued that:

8

The enhancement is based on efforts made by Colavalla to begin the process of restitution payments in advance of his sentencing. In conversations with present counsel, it was encouraged that Colavalla begin to gather restitution payments for the victims in this case. Unbeknownst to present counsel, Colavalla owned several thousand dollars of crypto-currency. Specifically, he owned several thousand dollars of XUSD crypto-currency. It was intention to use his crypto-currency to attempt to make the victim's [sic] whole. In his effort to see if this could be done, Colavalla sought the counsel of an attorney that he had previously worked with on legal matters. Colavalla was unaware that the attorney, Jospeh [sic] Turner ("Turner"), was now disbarred and not authorized to practice law. Colavalla only became aware of this fact when he appeared in United States District Court for his detention hearing on the warrant.

In making restitution, Colavalla sought Turner's assistance. Turner reached out to the victims in an effort to facilitate the payment of restitution using the crypto-currency. It is important to note that crypto-currency is a highly speculative investment, whose value fluctuations are volatile. The crypto-currency that was being offered was not "live" and had not yet been set. There appears to be correspondence where Turner acknowledged that point to the people receiving the offer. . . .

Colavalla relied upon the guidance of an attorney to help him traverse the efforts to make the client's [sic] whole. He relied upon the guidance of Turner to give him legal counsel, not knowing he had been disbarred. All of the correspondence with the victims was handled through phone calls and electronic mail. None of the messages to the victims came from Colavalla. In correspondence with the victims, Turner included a waiver that he had prepared. The waiver indicated that the victims would "not hold Mr. Colavalla responsible either legally of financially" and that the victims did not "wish any legal matters to be pursued against Mr. Colavalla."

. . . .

The defendant would argue that his efforts to make restitution to the victims in this matter were well-intentioned. He owned crypto-currency which he believed would be valuable and a vehicle by which to repay victims. . . . His mistake was relying upon the advice of outside counsel to help facilitate that transfer. Counsel again, unbeknownst to him, had been disbarred. It was this counsel that directed the interactions with the victims in this case.

(ECF No. 198, at 2–3.) Counsel also moved for a variant sentence of 46 months, arguing that Colavalla's co-conspirators, who he suggested played a larger role in the scheme, received 46 months of incarceration, and because he had no criminal history, that his post-plea conduct was simply an attempt to re-pay the victims as quickly as possible, and that he needed medical treatment. (ECF No. 199, at 1–4.)

9

## D.    Sentencing

During sentencing, the Court agreed that Colavalla's conduct after his plea warranted an obstruction of justice enhancement

> because it is an attempt to get the victim to say, please, don't prosecute this fellow. And that it shows -- that he does not show acceptance of responsibility for two reasons. One of which is, that when you get the obstruction enhancement you don't get acceptance. And second, it shows he doesn't accept responsibility. He is just trying to get -- trying to get out of trouble.

(ECF No. 213, at 7.) The Government also noted that the victim whom Colavalla contacted and paid, was from the same church as a victim who had testified at his co-defendants' sentencing about his loss and was going to testify as a witness during Colavalla's sentencing, and that the guidelines for obstructing justice specifically mentioned "unlawfully influencing or attempting to influence a witness." (*Id.* at 8.) The Government pointed out that "[g]iven the timing of when this occurred after his guilty plea, we would certainly also say that this is an instance where his obstructive conduct is evidence of lack of remorse and lack of acceptance of responsibility." (*Id.* at 9.)

Counsel argued that based on his interactions with Colavalla, he did not "think Mr. Colavalla understands how things work generally when you get to these t[ypes] of activity." (*Id.* at 10.) Counsel attempted to point the blame on himself and noted that he

> told him, look, your best bet is to start getting money together now. These folks need to be made whole. At the end of the day what you get will be unfortunate and it will be hard for you, but these folks need to be made whole. Whatever you can do in advance of court is going to enure to your benefit. We had a couple of those conversations.
> I missed a phone call from him following up, oh, there is an attorney that is going to help me. And he sent to me, he being Mr. Colavalla, a stack of e-mails from this attorney who candidly I have a recording on m[y] voice mail, several of them, hey, I am helping Jason [sic] out with this. I am helping him get restitution together. So I said, okay, keep me posted. We have a sentencing coming up. And I got a stack of e-mails, all of the e-mails, there are 11 of them to be exact, all of them are from Mr. Joseph Turner. Not a one of them is from Mr. Colavalla reaching

10

out to anybody. And they are all, the general gist is what you have read. Mr. Colavalla owns some crypto currency, would like to pay this now to try to make you all whole. And he puts in these messages, they don't have value yet, they haven't gone "live." I don't understand crypto currency. . . . But their explanation, these inter between these few people that showed interest that, hey, is there an option for actual currency, but there is a dialogue going on between this attorney and these folks. I get the e-mails from Mr. Colavalla. Next day get the e-mail from Mr. Moore saying Mr. Colavalla has been arrested, and he is, here is what we are looking for.

At no point I think, as you read these e-mails, there is language in it we are asking you to say that he tried to make you whole, and you don't hold him liable. . .

In a few of the e-mails where they ask, are we still able to testify? This person, who, as it turns out is a disbarred attorney, and when I asked Mr. Colavalla, I said, did you realize?

. . . .

So, I understand the way that it looks. But the simple reading of it is that Mr. Colavalla had some crypto currency, which he believed would have some value at some point. And at my encouragement he said, I was going to try to get money together for restitution.

(*Id.* at 10–12.) The Court pointed out that Colavalla "knew he wasn't supposed to be in contact with any witnesses [or] victims," and counsel responded that he thought "in [Colavalla's] naïve mind because he [was] not reaching out directly to them, he ha[d] sought an attorney." (*Id.* at 12.) Counsel continued:

Now in a perfect world he would have come to me, and I would have said, all right, let me reach out to Mr. Moore. We will try to facilitate the payment of, you know, initial payments. That didn't happen. And I wish it had. And it may be because I missed the call. The day Mr. Colavalla called and said I wasn't able to do this, he turned to an attorney he knew in the past. Said, hey, can you help me? And so this attorney became the go between [for] Mr. Colavalla and the few victims who responded. I don't think there was any direct contact between Mr. Colavalla and the witnesses an[d] the victims.

(*Id.* at 12–13.) Counsel admitted that Mr. Turner contacted him to talk generally, and then once Colavalla was arrested, Mr. Turner called him indicating that it was urgent to speak with him. (*Id.* at 13.) At that point, however, counsel knew that Mr. Turner was disbarred and chose not to have contact with him. (*Id.*) Counsel claimed that in "perfect world" he would have told Colavalla to

11

"step away, don't mess with it" with respect to Mr. Turner. (*Id.*) Counsel also attempted to blame the release sought from the victim on Mr. Turner, not Colavalla. (*Id.* at 14.) The Court was not buying counsel's arguments, and stated:

> This is just consistent with everything else Mr. Colavalla says, that it is all somebody else's fault and he doesn't know what is going on. That is what he says about how this whole scheme worked. That it was all Crock and these other guys that put all this together, and he was just parroting their words. And that is what we have here, the same thing, on the back end of it.

(*Id.*)

In the end, the Court denied counsel's objection. (*Id.* at 15.) The Court explained that:

> I think there is contact with the victim to try to get the victim to essentially tell the government they don't want anything bad to happen to Mr. Colavalla, is maybe not classic obstruction because he already pleaded guilty, but it is clearly obstruction that is designed to influence the outcome of the case.
> And it violates the terms of his pretrial release to boot. So, I think it is obstruction under the guidelines, and I think with that, the obstruction, he doesn't get the three points off for acceptance of responsibility, and even if it wasn't obstruction, clearly it is an attempt to escape responsibility for things that he has done in the past. So, I think it is just the opposite of acceptance of responsibility.

(*Id.* at 15–16.) The Court refused to impose a variant sentence and sentenced Colavalla to 87 months of imprisonment. (*Id.* at 35.)

On February 18, 2025, Colavalla filed his § 2255 Motion. (ECF No. 251.) On November 25, 2025, the Court granted Colavalla's motion for a reduction in sentence pursuant to 18 U.S.C. § 3582(c)(2) and reduced his sentence to 71 months. (ECF No. 287.)

## II. ANALYSIS

### A.   Ineffective Assistance of Counsel

To demonstrate ineffective assistance of counsel, a convicted defendant must first show that counsel's representation was deficient, and second, that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficient

12

performance prong of *Strickland*, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. *Id.* at 697.

In the context of a guilty plea, the Supreme Court has modified this second prong of *Strickland* to require the convicted defendant to "show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Of course, in conducting the foregoing inquiry, the representations of the convicted defendant, his lawyer, and the prosecutor during the plea proceedings, "as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977). In light of the strong presumption of verity that attaches to a petitioner's declarations during his plea proceedings, "in the absence of extraordinary circumstances, allegations in a § 2255 motion that directly contradict the petitioner's sworn statements made during a properly conducted Rule 11 colloquy are always 'palpably incredible' and 'patently frivolous or false.'" *United States v. Lemaster*, 403 F.3d 216, 221 (4th Cir. 2005) (citations omitted). Thus, the Fourth Circuit has admonished that "in the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should,

13

without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements." *Id.* at 221–22. No circumstances exist here that would lead the Court to consider Colavalla's prior sworn statements as other than truthful.

In his § 2255 Motion, Colavalla alleged the following, in sum:

> "Violation of the Sixth Amendment right to effective assistance of counsel. There was virtually no communication with my attorney. He rarely answered phone calls, texts, or emails. The result was a failure to understand my plea agreement or the overall exposure I had to incarceration. When we did communicate, we did nothing but argue, this fact is supported in the transcripts of both the change of plea and sentencing hearings. This all resulted in my seeking advice and assistance from an attorney that I did not know was disbarred. His recommendations, and efforts to assist my interests, resulted in my obstruction of justice enhancements and disqualification for acceptance of responsibility."

(ECF No. 251, at 4.)

## B. Pre-Plea Claims of Ineffective Assistance

Colavalla's contentions about counsel's alleged ineffectiveness leading up to his guilty plea are belied by his validly entered plea and his statements under oath at the Rule 11 hearing to the contrary. Colavalla agreed that he was fully satisfied with the services and advice rendered by counsel. He agreed that counsel had answered all of his questions, they had gone over the plea agreement thoroughly, and admittedly gone "around and around," but that counsel had explained everything to him and done everything he has asked him to do. (*Id.* at 11–12.) Colavalla agreed that counsel had reviewed the sentencing guidelines with him and potentially sentences. The Court read the charges to Colavalla, he agreed he understood them, and ultimately, he agreed that he was guilty of the charged conduct. The Court also explained to Colavalla that any estimate of what his sentence might be from counsel was a prediction and that the Court could sentence him to any sentence up to twenty years of incarceration. Colavalla agreed he understood. Based on his representations in his plea hearing, therefore, Colavalla's allegations here that counsel failed to

14

communicate with him, and that he did not understand his plea agreement or sentencing exposure, are palpably incredible and are barred by his validly entered guilty plea. *Lemaster*, 403 F.3d at 221 (internal quotation marks omitted) (citation omitted).

Colavalla also fails to demonstrate any prejudice. First, Colavalla does not argue, as he must, that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. That alone forecloses his claim. Second, because the Court thoroughly questioned Colavalla about counsel's performance and Colavalla's understanding of the charge against him, his guilt, and sentencing exposure, Colavalla cannot demonstrate any prejudice flowing from an alleged lack of communication from his counsel or his purported lack of understanding of his plea or potential sentence. *United States v. Foster*, 68 F.3d 86, 88 (4th Cir. 1995). Any claim that counsel was ineffective with respect to his decision to plead guilty is belied by the record and lacks merit.

## B.    Alleged Ineffective Assistance Post-Plea

Colavalla also contends that counsel rendered ineffective assistance through his lack of communication with him after his guilty plea. In his Reply, Colavalla greatly expands this aspect of his claim. Colavalla suggests that: "It was during the time between the plea and sentencing that my attorney failed to adequately represent me." (ECF No. 278, at 1.) Colavalla then faults counsel for failing to respond to his inquiries contesting his guilt and for failing to continue to investigate his involvement in the criminal activity to which he had pled guilty. (*Id.* at 1–2.) In essence, Colavalla continued to insist he was not guilty and blames counsel for not pursuing his theories or further discussing them. By pleading guilty, however, Colavalla waived his right to contest the sufficiency of the evidence or to contest the factual merits of the charges. *United States v. Willis*, 992 F.2d 489, 490 (4th Cir. 1993). After his client entered into a valid guilty plea, counsel

15

would have reasonably eschewed investigating any proffered defenses to the crime. Colavalla could no longer argue that he was not guilty unless he wished to invalidate his plea agreement. (ECF No. 89-3 ¶ 8.) Counsel cannot be faulted for failing to investigate Colavalla's guilt after he entered his guilty plea, and Colavalla was not prejudiced by counsel's actions.

Next, Colavalla faults counsel for "fail[ing] to get any written agreement pertaining to [his] extensive cooperation" and for not presenting to the Court "evidence of [his] cooperation . . . in mitigation of the crimes [he] was being sentenced to." (ECF No. 278, at 2.) First, Colavalla was only convicted of one crime, so any idea that he was sentenced for "crimes" is misplaced. Second, counsel cannot be faulted for failing to present evidence to the Court before or during sentencing that Colavalla should receive a lesser sentence for cooperating with the Government.[4] Colavalla fails to identify with any specificity the details of this "extensive cooperation" or how it could have mitigated the length of his sentence. For this reason alone, his claim fails. *Sanders v. United States*, 373 U.S. 1, 19 (163) (finding denial of § 2255 motion appropriate where it "stated only bald legal conclusions with no supporting factual allegations"); *cf. Bassette v. Thompson*, 915 F.2d 932, 940–41 (4th Cir. 1990) (requiring proffer of mitigating evidence to state a claim of ineffective assistance). Moreover, in light of Colavalla's clear obstruction of justice and refusal to accept responsibility of his guilt by attempting to tamper with victims who may have been witnesses at his sentencing— which is the opposite of cooperation—counsel wisely eschewed making such arguments. Counsel cannot be faulted for failing to present alleged evidence of cooperation, and Colavalla was not prejudiced.

---

[4] To the extent Colavalla believes that he should have received a reduction in sentencing for substantial assistance to the Government under USSG § 5K1.1, it is unclear whether that was ever on the table. Additionally, the Government alone retains the right to move for a reduction in sentence for cooperation. Colavalla's Plea Agreement contained no language that a reduction in sentence for substantial assistance was an option.

Finally, Colavalla attempts to place the blame on counsel for his ill-advised actions in contacting victims and offering them worthless sums of crypto-currency in exchange for their agreement to release him from liability and/or not testify about their losses at sentencing. Although not explicit, Colavalla seemingly suggests that if counsel had been more communicative with him, he would not have engaged in this restitution scheme and would not have reached out to another attorney to execute this endeavor. This defies belief and is just another example of Colavalla refusing to accept any personal responsibility for his actions.

First, Colavalla fails to identify with any specificity how and when he attempted to contact counsel and counsel failed to respond. In his § 2255 Motion, at most he states: "There was virtually no communication with my attorney. He rarely answered phone calls, texts, or emails." (ECF No. 251, at 4.) In his Reply, Colavalla faults counsel because "on numerous occasions [he] failed to respond to my inquiries." (ECF No. 278, at 1.) Colavalla, however, complains that counsel refused to further discuss his culpability or pursue further investigation that would show he was innocent after he entered his guilty plea. (ECF No. 278, at 1.) These allegations lack the requisite specificity to show that counsel was ineffective for his purported refusal to communicate with Colavalla as often as Colavalla desired. For this reason alone, Colavalla fails to demonstrate any deficiency of counsel or resulting prejudice. *Sanders*, 373 U.S. at 19.

It is unclear from the record when exactly counsel became aware of Colavalla's scheme to obstruct justice. It was not counsel's purported lack of response to Colavalla's emails, texts, and phone calls, however, that caused Colavalla to engage in this post-plea restitution scheme as Colavalla seemingly claims. Counsel admitted that he missed one call from Colavalla where Colavalla indicated that he had engaged an attorney to help him with restitution and that Colavalla forwarded emails from that attorney to counsel. Thus, Colavalla, on his own initiative, decided to

17

engage an attorney that he had a prior relationship with for this restitution scheme.[5]  Counsel also admitted that he had messages from that attorney indicating that he was "helping [Colavalla] get restitution together," and counsel indicated to that attorney that he should "keep [him] posted" because they had "sentencing coming up." (ECF No. 213, at 10.) Counsel noted that the day after he received the forwarded emails from Colavalla, he received the email from the Government informing counsel that Colavalla had been arrested. (*Id.* at 11.) Thus, the damage was done.

To the extent that Colavalla faults counsel for not realizing earlier what Colavalla's intentions were and stopping him, that was not required of counsel. Counsel was not obligated to guess that Colavalla was going to attempt to contact witnesses and engage in witness tampering and pre-emptively advise him that he should not engage in this behavior. Colavalla knew that he was not allowed to contact witnesses as that was a term of his bond. Colavalla's decision to engage in this behavior was entirely his own. *Cf. United States v. Goad*, 2012 WL 5416424, at *8 (E.D. Va. Nov. 6, 2012) (explaining that petitioner "cannot show prejudice based on his personal decision to violate his Plea Agreement by being dishonest" (citation omitted)); *Arakelian v. United States*, Nos. 08 Civ. 32224(RPP), 04 Cr. 447(RPP), 2009 WL 211486, at *6 (S.D.N.Y. 2009) ("[H]aving affirmatively lied in his declaration to this Court, Petitioner cannot now shift the blame for his own misconduct onto his attorney who represented him in the matter." (citations omitted)). Counsel's purported refusal to communicate with Colavalla as often as he desired had no bearing on Colavalla's decision to engage a different attorney for a scheme to pay off victims to discourage them from testifying at sentencing.[6]

---

[5] During the Rule 11 hearing, Colavalla indicated that he worked with his "attorney friend," Mr. Turner, in 2019, involving some of the criminal activity in this case. (ECF No. 212, at 16–17.)

[6] Once the damage was done, counsel argued strenuously against the obstruction of justice enhancement and the loss of acceptance of responsibility. Counsel tried to mitigate Colavalla's

In sum, Colavalla fails to show any deficiency of counsel or resulting prejudice. Accordingly, Claim One lacks merit and will be DISMISSED.

### III.    CONCLUSION

The § 2255 Motion, (ECF No. 251), will be DENIED. Colavalla's claim and the action will be DISMISSED. A certificate of appealability ("COA") will be DENIED.[7]

An appropriate Final Order shall accompany this Memorandum Opinion.

/s/

John A. Gibney, Jr.
Senior United States District Judge

Date: 7 April 2026
Richmond, Virginia

---

actions by explaining that Colavalla may not have understood counsel when he told Colavalla to gather money for future restitution payments. Counsel tried to explain that he did not believe that Colavalla was sophisticated enough to know what he was doing was wrong and he did not know that the attorney he was working with for restitution payments was disbarred. While the Court was not persuaded, counsel cannot be faulted for the Colavalla's receipt of an enhanced sentence.

To the extent Colavalla argues that he received bad advice from a disbarred attorney that he personally sought out to make alleged restitution payments, that is not the fault of counsel in his criminal proceedings. Rather, "[t]he Constitution guarantees the effective assistance only by the attorney 'who represents the criminal defendant and helps to prepare his defense.'" *Day v. United States*, No. 7:07-cv-00376, 2008 WL 222316, at *5 (W.D. Va. Jan. 25, 2008) (quoting *United States v. Martini*, 31 F.3d 781, 782 (9th Cir. 1994)).

[7] An appeal may not be taken from a final order in a § 2255 proceeding unless a judge issues a COA. 28 U.S.C. § 2253(c)(1)(B). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Colavalla has not met this standard.

19